# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                                    CASE NO. 11-556 (GAG)

HILTON CORDERO-ROSARIO,

Defendant.

## OPINION AND ORDER

I.    **Background**

On February 1, 2013, defendant Hilton Cordero-Rosario ("defendant "or "Cordero-Rosario") entered into a conditional agreement in which he pleaded guilty to count 21 of the superseding indictment charging him with possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  (Docket No. 80.)[1]  Per the terms of said agreement, Cordero-Rosario reserved the right to challenge on appeal the Court's order denying his motion to suppress.  Id.  The Court sentenced Cordero to one hundred and twenty months imprisonment, the statutory maximum, followed by fifteen years of supervised release.  (Docket No. 114.)

Cordero-Rosario subsequently appealed the Court's denial of his motion to suppress in which he moved to exclude all evidence seized from the two searches conducted by the Puerto Rico Police Department ("PRPD"), as well as the evidence that stemmed therefrom. The First Circuit vacated

---

[1] Counts 1-20 of the superseding indictment charged Cordero-Rosario with production of child pornography, in violation of 18 U.S.C. § 2251(a). Counts 21-22 charged him with possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B).  (See Docket No. 29.)  Per the terms of the conditional plea agreement, the Government agreed to dismiss the production of child pornography charges, and count 22. (Docket No. 80.)

the Court's suppression ruling and remanded the case back to this Court. The appellate court found that the searches that took place on February 4 and February 26 were invalid because they lacked probable cause, thus violated Cordero-Rosario's Fourth Amendment Rights. See United States v. Cordero-Rosario, 786 F.3d 64, 68-72 (1st Cir. 2015). The court, however, remanded the matter for a hearing and determination on whether evidence obtained pursuant to the consent of defendant's former spouse was tainted by the prior unlawful searches. Cordero-Rosario, 786 F.3d at 77.

In light of the First Circuit's ruling, the Court must determine which evidence, if any, is tainted by the prior unlawful PRPD searches, pursuant to the "fruit of the poisonous tree" doctrine and the taint/attenuation test articulated in Brown v. Illinois, 422 U.S. 590 (1975) and United States v. Finucan, 708 F.2d 838 (1st Cir. 1983). Cordero-Rosario, 786 F.3d at 77.

Following remand, the Court ordered the government to inform if it had independent evidence to present its case. (Docket No. 129.) The Government in turn, listed the following evidence: A) images and other evidence found in the family desktop computer, to support Counts 1-20 of the Superseding Indictment (Production of Child Pornography), and Count 21 of the Superseding Indictment (Possession of Child Pornography); B) evidence obtained from the 320 GB Western Digital external hard drive, with serial number WMAM1543470 (hereinafter "320 GB External Hard Drive"), to support Count 22 of the Superseding Indictment (Possession of Child Pornography); and C) the live testimony of the then minor involved, referred throughout this Opinion as MMTH.[2]

_____

[2] While the admissibility issue was pending before the Court, the government, on July 7, 2016, a federal grand jury returned a Second Superseding Indictment charging the defendant with one count of Sex Trafficking of a Minor, in violation of 18 18 U.S.C.§ 1591(a), and one count of Possession of Child Pornography, in violation of 18 U.S.C.§ 2252(a)(4)(B). The Possession of Child Pornography count, Count 2 of the Second Superseding Indictment, is based on the defendant's possession of the same sexually explicit images included in Count 22 of the Superseding Indictment that were found on the 320 GB External Hard Drive. See Docket No. 173.

The undersigned referred the pending admissibility issues to Magistrate Judge Silvia Carreño-Coll for a hearing and Report and Recommendation.[3] (Docket No. 143.) A suppression hearing was held on April 13, 2016 before Judge Carreño-Coll.[4] (Docket No. 161.) The Government presented the following witnesses: Agent Rebecca González Ramos, Agent Lillian Agudelo, Deborah Martorell and Idalia Hornedo, MMTH's mother.

Defendant Cordero-Rosario submitted to the Court his legal arguments after the hearing, in writing. (Docket No. 164.) The Government responded. (Docket No. 165.) Judge Carreño-Coll issued her report and recommendation, which is discussed in full below. (Docket No. 191.) Defendant Cordero-Rosario objected.[5] (Docket Nos. 192 & 208.) The Government responded in opposition to Cordero-Rosario's objections. (Docket No. 205.) Per leave of Court, Cordero-Rosario replied. (Docket No. 210.)

## II.    The Report and Recommendation

Judge Carreño-Coll recommends the suppression of the evidence obtained as a result of the computer search executed pursuant to the consent of defendant's former spouse, Deborah Martorell. As to the remaining evidence —320 GB External Hard Drive, the live testimony of MMTH and the Sony CyberShot Camera— she recommends admission. (Docket No. 191.)

The undersigned **ACCEPTS and ADOPTS,** Magistrate Judge Carreño-Coll's factual findings and legal conclusions regarding the suppression of evidence obtained as a result of the

---

[3] On November 8, 2016, while the Report and Recommendation was still pending, Defendant Hilton Cordero filed an "Urgent Motion Requesting Release Pending Resolution of Motion to Suppress." (Docket No. 183.) The Government opposed. (Docket No. 189.) Defendant's Motion requesting relief is also pending.

[4] The defendant was present in court, under custody. (Docket No. 161.)

[5] Cordero-Rosario first raised his preliminary objections in which he requested the preparation of the Suppression hearing transcript to adequately object the Magistrate Judge's factual findings. (Docket No. 192.) The Court ordered the preparation of the transcripts and gave the parties additional time to supplement their objections with the transcript of the hearing. (Docket No. 193.)

computer search, pursuant to Martorell's consent. (Docket No. 191 from 33 to 38.) Accordingly, the evidence found during the search of the family computer during the "federal investigation" — including the sexually explicit images of MMTH, and chat conversations between Cordero and MMTH contained therein— are suppressed.

Due to the fact-intensive nature of the issue before the Court, Judge Carreño-Coll shrewdly pieced together, in chronological order, the events relevant to Cordero-Rosario's Suppression. The undersigned **ADOPTS** the findings of fact in Judge Carreño-Coll's Report and Recommendation. (See Docket Nos. 191 from 9 to 27.) The Court will not retell the story, only the facts relevant to the Court's *de novo* review will be discussed.

Cordero-Rosario objects to the Report and Recommendation, arguing that the 320 GB External Hard Drive and MMTH's live testimony are tainted and therefore must be suppressed. Specifically, Cordero-Rosario argues that the record does not support the conclusion that the circumstances that led up to the discovery of the 320 GB External Hard Drive present ample indicia of attenuation from the initial taint. (Docket No. 201 at 6.) He raises the same argument as to MMTH's testimony. Id.

In response to Cordero-Rosario's objection, the Government argues that Martorell's testimony evinces the existence of intervening circumstances that were strong enough to break the chain and purge the taint of the initial illegality. (Docket No. 208.) The Government posits Martorell's decision to voluntarily surrender the 320 GB External Hard Drive can only be understood to be the product of her detached reflection and a desire to be cooperative with federal law enforcement authorities. Further, the Government notes that in her testimony, Martorell explained that her decision to turn over the hard drive "was driven by a sincere desire to see if there were any more victims of the defendant and to confirm the allegations that were raised by her daughter PCM

prior to the PRPD searches." (Docket No. 208 at 13.) Hence, "her primary concern was that her daughter not be labeled a liar for having had the courage to come forward with allegations of sexual misconduct by her father; an interest and motivation that predates, and is otherwise unrelated to, the tainted PRPD searches." Id.

Upon Cordero-Rosario's objections, the Court reviews *de novo* the Magistrate Judge's factual findings and legal conclusions regarding the admissibility of the 320 GB External Hard Drive and the testimony of MMTH.

## III.    Standard of Review

The Court may refer motions to suppress to a United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). See FED. R. CRIM. P. 59; see also L. Crim. R. 159; Matthews v. Weber, 423 U.S. 261 (1976). An adversely affected party may contest the report and recommendation by filing its objections. FED. R. CRIM. P. 59. Moreover, 28 U.S.C. § 636(b)(1), in pertinent part, reads as follows:

> [A]ny party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.

"Absent objection, . . . [a] district court ha[s] a right to assume that [the affected party] agree[s] to the magistrate's recommendation." Templeman v. Chris Craft Corp., 770 F.2d 245, 247 (1st Cir. 1985). Additionally, "failure to raise objections to the Report and Recommendation waives that party's right to review in the district court and those claims not preserved by such objections are precluded upon appeal." Davet v. Maccarone, 973 F.2d 22, 30-31 (1st Cir. 1992); see Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994) (holding that objections are required when challenging findings actually set out in a magistrate's recommendation, as well as

the magistrate's failure to make additional findings); see also Lewry v. Town of Standish, 984 F.2d 25, 27 (1st Cir. 1993) (stating that "[o]bjection to a magistrate's report preserves only those objections that are specified"); Borden v. Sec. of H.H.S., 836 F.2d 4, 6 (1st Cir. 1987) (holding that appellant was entitled to a *de novo* review, "however he was not entitled to a de novo review of an argument never raised"); see FED. R. CRIM. P. 59(d).

## IV. Legal Analysis

The Court must determine which evidence, if any, is tainted by the unlawful PRPD searches. In doing so, the Court must define the outer limits of contamination following an illegal search.

Magistrate Judge Carreño-Coll ultimately concluded that the police obtained Martorell's consent to search the family computer by exploitation of the illegality:

> When she gave consent, Martorell had already seen some of the images that were in the unlawfully seized computer. What is more, she had seen those crude images scarcely a month before she signed the consent form. The close temporal proximity between viewing the pictures and granting consent leads this court to the conclusion that the impression of seeing those pictures was fresh in her mind.
>
> Martorell's emotional testimony confirms it. She described how, when she saw the pictures, she kept asking herself whether there could be pictures of her daughter or other victims in there. She also related how she went home after the meeting with the state prosecutors and began to go frantically through Cordero's belongings. It seems that whereas before, Martorell could have harbored doubts as to the extent of Cordero's action–which might explain why she did not come forward previously–seeing those pictures provided confirmation.

(Docket No. 191 at 34-36.) The undersigned agrees with the Magistrate Judge's finding that "Martorell's mental state was deeply influenced by the images that she had seen, the images that had been illegally obtained by the PRPD." (Docket No. 191 at 36.) Consequently, Judge Carreño-Coll concluded that "Martorell's consent flowed directly from the original unlawful search that yielded the images and cannot be said to be the result of 'detached reflection.'" Id. at 37 (quoting State of Iowa v. Lane, 726 N.W.2d 371, 386 (Iowa 2007)).

The Court adopts Magistrate Judge Carreño-Coll's finding that Martorell's consent was obtained in exploitation of the illegality, thus, the "federal investigation" stemmed from the investigation led by local authorities. Judge Carreño-Coll found that the <u>Lane</u> factors "inexorably lead[] to the conclusion that the taint was not attenuated." (Docket No. 191 at 38). Consequently, she concluded that Martorell's consent was tainted by the prior unlawful searches. <u>Id.</u> As a result of this finding, "it follows that the evidence obtained as a result of the subsequent search of the computer conducted by the federal agents must be excluded." <u>Id.</u>

A. <u>Applicable Law and First Circuit's Mandate</u>

The First Circuit's pellucid mandate traces the path for the Court on remand. "[I]f the District Court should find that the Puerto Rico police's unlawful searches did not taint the federal authorities' consent-based search, then the District Court must decide which, if any, of the government's evidence stemmed solely from the Puerto Rico police's searches." <u>Cordero-Rosario</u>, 786 F.3d at 78. On the other hand, if the Court rules that unlawful searches tainted the federal investigation, "then the District Court must decide which, if any, evidence the government seeks to introduce must be suppressed in consequence of that tainted relationship." <u>Id.</u>

The question whether evidence obtained after an illegal search should be suppressed as the fruit of the poisonous tree depends upon "*whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint*." <u>Finucan</u>, 708 F.2d at 843 (quoting <u>Wong Sun v. United States</u>, 371 U.S. 471 (1959) (internal quotation marks omitted) (emphasis added). "Such an analysis depends primarily upon weighing the facts in the particular case, and is thus a matter especially suitable for resolution by the district court." <u>Id.</u> "The notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action

7

become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." Cordero-Rosario, 786 F.3d at 75–76 (quoting Brown, 422 U.S. at 609 (Powell, J. concurring)).[6]

The Supreme Court in Brown spelled the following factors relevant to the taint/attenuation analysis: (1) the time that elapsed between the underlying illegality and the later acquisition of the evidence at issue; (2) the presence or absence of intervening circumstances between those points in time; and (3) the purpose and flagrancy of the official misconduct in question. Brown, 422 U.S. at 603–04.

"[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." United States v. Camacho, 661 F.3d 718, 728–29 (1st Cir. 2011) (quoting New York v. Harris, 495 U.S. 14, 19 (1990)). Moreover, "[s]uppression is not appropriate, . . . if 'the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" Camacho, 661 F.3d at 728–29 (quoting Segura, 468 U.S. at 804 (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)).

In Cordero-Rosario, the First Circuit distinguished this case from Brown and United States v.Navedo–Colón, 996 F. 2d 1337 (1st Cir. 1993), which presents the classic scenario in which a

---

[6] Under the exclusionary rule, evidence obtained during a search may be tainted by the illegality of an earlier Fourth Amendment violation, "so as to render such evidence inadmissible as 'fruit of the poisonous tree." United States v. D'Andrea, 648 F.3d 1, 6 (1st Cir. 2011) (quoting Wong Sun, 371 U.S. at 488) (internal quotation marks omitted); see also Camacho, 661 F.3d at 728–29.

The exclusionary rule not only contemplates the primary evidence "obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree." Camacho, 661 F.3d at 728 (internal citations omitted); see also Segura v. United States, 468 U.S. 796, 804 (1984) (explaining that the exclusionary rule "'extends as well to the indirect as the direct products' of unconstitutional conduct") (quoting Wong Sun, 371 U.S. at 484.) "In a similar vein, the Supreme Court has suggested that the key inquiry in cases seeking to suppress the indirect fruits of prior illegal law enforcement conduct concerns "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Cordero-Rosario, 786 F.3d at 76.

defendant seeks to suppress his own confession made after an unlawful search or seizure. 786 F. 3d at 76. Here, Cordero-Rosario is seeking to suppress evidence obtained pursuant to consent supplied not by himself but by his then-wife— a third party. Id.

In Finucan, the appeals court deemed dispositive factors: 1) whether absent the illegal search, "the investigators [would] have known the identity of all of the third parties [or] what to ask them.' In that regard, we considered whether 'the government anticipated that the illegal search would help lead it to the other dealers and documents'" and; 2) whether "'third parties would have come forward on their own had the investigators not sought them out.'" Cordero-Rosario, 786 F.3d at 77 (quoting Finucan, 708 F.2d at 844) (internal citations omitted) (alteration in original).

After discussing Brown and Finucan, the First Circuit concluded that "[t]he success of Cordero's suppression motion turns on whether the evidence obtained pursuant to [Martorell's] voluntary consent was tainted by the prior unlawful searches by the Puerto Rico police," and recognized the that this inquiry is "highly fact dependent and "amorphous.'" Id. To this end, the First Circuit expressly outlined the factors the court should consider when conducting the attenuation analysis of evidence acquired by third-party consent.[7] 786 F.3d at 78. The Court may consider the Finucan factors as well as the Brown factors, "which courts have applied in cases involving motions to suppress allegedly tainted evidence acquired pursuant to third parties granting consent to searches." Cordero-Rosario, 786 F.3d at 77 (internal citations and quotations omitted); see also United States v. Hill, 649 F.3d 258, 267–68 (4th Cir. 2011); Lane, 726 N.W.2d at 380–92 (discussing numerous considerations in addition to the Brown factors in fruit of the poisonous tree case involving

---

[7] "[U]nlike in Navedo–Colón, [t]he fact that the prior unlawful searches by the Puerto Rico police led the federal authorities to a third party who then consented does not in and of itself show that the taint and exploitation concern simply disappears from view, as our decision in Finucan, shows." Cordero-Rosario, 786 F.3d at 76–77 (internal citations omitted) (alterations in original).

third-party consent) (some internal citations omitted). Finally, the Court concluded that "[b]alancing these factors will illuminate the extent of attenuation in this case, and, along with it, the deterrence value of excluding evidence derived from [Martorell's] consent." Cordero-Rosario, 786 F.3d at 77–78.

### B. 320 GB External Hard Drive

Per the First Circuit's mandate, the Court now turns to the attenuation/taint analysis of the 320 GB External Hard Drive. For purposes of the attenuation/taint analysis, the Court summarizes only the relevant facts. Then, the Court weighs the Brown and Finucan factors, along with the deterrence value of the exclusionary rule based on the relevant factors of this case.

Magistrate Judge Carreño-Coll found that the 320 GB External Hard Drive was not tainted by the illegal PRPD searches and therefore, the External Hard Drive should not be suppressed. Cordero-Rosario objects to this finding. Id. Specifically, Cordero-Rosario contends that Martorell's decision to turn over the external hard drive was not an act of volition sufficiently withdrawn from the initial illegality, thus he argues, said evidence is tainted by the prior illegal search. (Docket No. 201.) He further argues that, because the external hard drive first came up during the April 15, 2011 meeting—the meeting where Martorell consented to the search of the family computer that Magistrate Judge Carreño-Coll found to be tainted by the initial illegality— the record does not support the finding of ample indicia of attenuation enough to break the chain and purge the taint. (Docket No. 201 at 7.)

Key to the Court's attenuation/taint analysis of the 320 GB External Hard Drive is Martorell's April 15, 2011 meeting with federal authorities and the events that took place after. As part of the local investigation that took place during March 2011, Martorell met with state prosecutors and was shown explicit images, which had been obtained through the illegal searches

conducted by the PRPD. Local agents also told Martorell that they were going to contact federal authorities. Less than a month later, Martorell was contacted by Agent Lillian Agudelo, a Special Agent with Homeland Security Investigations, Cyber Crimes Group. Agudelo asked Martorell if they could meet. On April 15, 2011, Martorell met with Agent Agudelo and Agent Pacheco at the ICE offices in San Patricio. At the Suppression Hearing, Agent Agudelo testified that the purpose of the meeting was to obtain Martorell's consent to search the family computer that had been previously searched by the local authorities. Martorell signed the consent form. After signing the consent form, Martorell informed Agudelo that there were other devices at her house that were left behind by the local authorities. She offered these to Agudelo so that they could be searched as well. (Docket No. 194 at 87.)

Q.      Do you recognize this?

A.      Yes.

Q.      And what is this document?

A.      That's the document that I signed that day.

Q.      This is your signature down below?

A.      Yes.

Q.      And this second page here, explain to us what that is.

A.      There, in writing, that I'm authorizing, that I'm giving all my consent for the computer of the home to be investigated. And that the information that the computer was used by the family, and that it didn't have a password.

Q.      Did anybody force you to sign this consent?

A.      No.

Q.      Did anybody make you any promises in exchange for signing this consent?

A.      No. The opposite. I wanted the Federal investigation.

1      Q.      Why?

2      A.      Because for transparency, I wanted them to look for more. When I saw those pictures of my neighbor, I asked myself, are there pictures of my daughter? Is there any other victim? And trust. I mean, if it was a Federal investigation, I trusted that investigation because of all the things that were happening with the investigation with my daughter. I mean, I wanted to be sure. I wanted everything -- I wanted to get to the end of this. I wanted a serious investigation.

Q.      After signing that consent, what, if anything, did you discuss with Agent Agudelo?

A.      I told her that there were also several things at the home, because since he built the computer, all the parts that were left over from building the computer were there, in addition to the old phones that were there.
      And since I also didn't know about the parts of the computer, I wanted her to go there to check on it, to look at it and take anything – if it was necessary, for her to take anything, in case there was more material there.

Q.      What effect, if any, did the fact that the locals had found child pornography have on your decision to turn over the equipment to the Federal authorities?

A.      The investigation, I wanted them to investigate, to look in the computer. That the state authorities had found something, okay. Yes. But I wanted to know if there was anything more.

Q.      What is it that you wanted them to investigate?

A.      The contents. All the contents. I want them to get to the bottom, to wherever they were going to go. But I wanted the investigation to occur.

(Docket No. 194 at 43-44.) A few days after the meeting at ICE in San Patricio, Agent Agudelo called Martorell to follow up on the additional electronic devices she mentioned and offered to hand over to the federal authorities. Agent Agudelo instructed her to put the items together and said she would pick them up. On April 21, 2011—just 6 days after the meeting at ICE—Agent Agudelo went to Martorell's residence to pick up the devices. Martorell had organized them on the dining room table, as he had instructed. Among these items was the 320 GB External Hard Drive. Agudelo took the External Hard Drive and several other electronic devices.

At the suppression hearing, Agent Agudelo testified that Martorell's demeanor was telling of her willingness to cooperate. She wanted to help the investigation "find the truth." (Docket No. 194 at 94.) Martorell testified that it was her desire help the federal authorities investigate further the findings of the local investigation. Using Martorell's own words, she wanted the federal authorities "to get to the bottom" of what the local authorities had illegally obtained. Martorell also testified that, because of Cordero-Rosario's position in the San Juan Municipal Police, she was concerned as to the integrity of the local investigation and that Defendant's position with the San Juan Municipal Police could influence the investigation.

### i. *Temporal Proximity*

The close temporal proximity between viewing the pictures, granting consent and turning over the electronic devices weighs in the defense's favor. As reasoned by Magistrate Judge Carreño-Coll, Martorell's emotional testimony is telling of how greatly influenced she was with "the impression of seeing those pictures which showed that they were still fresh in her mind." (Docket No. 191 at 35.) Both Martorell's consent and her voluntary proffer of the electronic devices took place simultaneously, during her April 15 meeting at ICE.

### ii. *Intervening Circumstances*

"[I]n determining whether intervening circumstances may have purged the taint of a prior illegality, we look not at the defendant's conduct, but rather at intervening event[s] of significance that render inapplicable the deterrence and judicial integrity purposes that justify excluding tainted evidence." United States v. Washington, 387 F.3d 1060, 1073–74 (9th Cir. 2004) (citing United States v. Perez-Esparza, 609 F.2d 1284, 1289, 1290 n. 3 (9th Cir. 1979); see also Dunaway v. New York, 442 U.S. 200, 218 (1979); United States v. Ricardo D., 912 F.2d 337, 343 (9th Cir.1990). "Intervening circumstances that militate in favor of attenuation must be sufficiently important to

ensure that potentially tainted evidence was 'come at by way of' some process other than the exploitation of an illegal search." Washington, 387 F.3d at 1074 (citing Wong Sun, 371 U.S. at 487–88).

Magistrate Judge Carreño-Coll found intervening circumstances between the illegality and Martorell's voluntary turnover the electronic devices sufficient to render her action "an act of volition sufficiently withdrawn from the original illegality." (Docket No. 191 at 39.) The intervening circumstances being: 1) the Agents had no prior knowledge of those other devices of their contents, 2) the fact that six days elapsed between the meeting with Agudelo and the actual turnover of the devices and Martorell did not change her mind, and 3) that she even "took on the task of gathering the gadgets and organizing them on the kitchen table." Id. at 39-40. For these reasons, she concluded that Martorell's "actions are indicative of the detached reflection and a desire to be cooperative described in Lane." (Docket No. 191 at 40.)

The undersigned finds it difficult to distinguish Martorell's signing of the consent form with her decision to turn over the external hard drive. Agent Agudelo called Martorell to accept the devices she had offered. As a result—just six days after giving consent—Martorell put her words into action, and organized the devices, per Agudelo's instructions. The post-consent events do not rise to the level of "intervening circumstances" sufficient to break the chain and purge the taint. The mere passing of six days and her affirmative actions were still linked to the original illegality and cannot be deemed, in this case, a product of her detached reflection. Martorell's testimony proves that, at that moment, her mental state was still influenced by the illegally obtained pictures. As a result of that influence, Martorell was, essentially, following orders.

As Magistrate Judge Carreño-Coll correctly concluded, "Martorell's consent flowed directly from the original unlawful search that yielded the images and cannot be said to be the result

of 'detached reflection.'" (Docket No. 191 at 37) (quoting <u>Lane</u>, 726 N.W.2d at 386). Relevant to the Court's analysis is the deep psychological injuries that are a natural consequence of the facts of this case, specifically by Martorell's mental state after enduring the agonizing task of seeing the crude pictures obtained by the PRPD. When discussing her conclusion that Martorell's consent was obtained by exploitation of the illegality, Magistrate Judge Carreño-Coll reasoned that: "As in <u>Finucan</u>, the agents banked on the illegally obtained evidence in guiding their investigation, at least in the beginning. Relying on the <u>Wong Sun</u> rationale, . . . the police obtained Martorell's consent by exploitation of the illegality." (Docket No. 191 at 34.) "When she gave consent, Martorell had already seen some of the images that were in the unlawfully seized computer. What is more, she had seen those crude images scarcely a month before she signed the consent form." <u>Id.</u> at 35. "It follows that, Martorell's mental state, at the moment she offered the electronic devices, was also deeply influenced by the images that she had seen, the images that had been illegally obtained by the PRPD." <u>Id.</u> at 35.

As such, the Court finds no intervening circumstances between the illegal searches and Martorell's turnover of the 320 GB External Hard Drive thus, that would render it "sufficiently an act of free will to purge the primary taint of the unlawful invasion." <u>Perez-Esparza</u>, 609 F.2d at 1289.

### iii. <u>*Purpose and flagrancy of the official misconduct*</u>

"The exclusionary rule exists to deter police misconduct. *The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant.*" <u>Utah v. Strieff</u>, 136 S. Ct. 2056, 2063 (2016) (citing <u>Davis v. United States</u>, 564 U.S. 229, 236–37 (2011)(emphasis added)). This factor "is considered the most important factor because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct." <u>United States v. Simpson</u>, 439 F.3d 490, 496 (8th Cir. 2006).

Purposeful and flagrant conduct exists when: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed "in the hope that something might turn up." Id. (quoting Brown, 422 U.S. at 605.)

When evaluating the flagrancy of the conduct, there are numerous factors to consider. "Some factors may weigh in favor of finding the conduct to be flagrant including that the illegal conduct involves the physical entry of the home[,] [which] is the chief evil against which the wording of the Fourth Amendment is directed." Hill, 649 F.3d at 270 (internal quotations omitted). "Other factors may weigh in favor of finding the conduct was not flagrant, *including that the officers did not use or exploit the evidence that they obtained during the initial search to gain consent.*" Id. (emphasis added).

The parties dispute the source of the federal government's knowledge that child pornography found during the lewd acts investigation conducted by the PRPD. Agent González testified at the suppression hearing that she first heard about the child pornography material in the news. (Docket No. 194 at 27.) Cordero-Rosario, on the other hand, contends that Gonzalez became aware of the existence of child pornography when she received a tip from the PRPD. (Docket No. 201 at 10.) During cross-examination, defense counsel confronted Gonzalez with a "Report of Investigation" from Martorell's May 16, 2011 interview. Judge Carreño-Coll deemed Gonzalez's version truthful. Gonzalez "explained that it is not customary to include in an ROI that an agent received information "from the news, even when that is the case." (Docket No. 191 at 14 n.11.) The undersigned gives deference to the Magistrate Judge's assessment of the witness' credibility and therefore adopts her finding of "Gonzalez' explanation to be truthful and have no reason to doubt that she, in fact, first heard about the child pornography materials through the news." Id.

Irrespective of the source of the information, Agent González testified that she contacted local prosecutors to verify the finding of child pornography material by the PRPD. She met with the local prosecutors and reviewed the search warrants. (Docket No. 191 at 15.) As soon as she reviewed the search warrants, she became concerned that these could be insufficient to search for child pornography. Id. Next, Agent González arranged a meeting with her supervisors and members of the United States Attorney's Office. (Docket No. 191 at 16.) The purpose of the meeting was to discuss her concerns regarding the state warrants. Then, they decided "to create an individual investigation away from the state and local search warrants." Id. "[I]t was decided that the federal agents would try to obtain Martorell's consent to search the computer that had been seized by the PRPD." Id.

Ironically, the "independent federal investigation" picked up where the PRPD left off. The close ties between the investigations manifests the flagrancy of the federal authorities' investigation. Agent González and the United States Attorney's office designed and orchestrated what they believed to be an "independent federal investigation." Even though Agents Pacheco and Agudelo were not privy to the discussions by the federal authorities where they discussed the flawed PRPD investigation, when assigned to conduct the "independent federal investigation" they were given specific instructions by their superiors to get Martorell's consent to search the computer that the PRPD has seized. This decision evinces they were acting upon the fruits of the PRPD searches to guide their investigation.[8] In a like manner, Magistrate Judge Carreño-Coll reasoned that "[t]he mere creation of a 'taint team' is not enough to attenuate the initial taint" and pointed out that "[r]ather than initiating the independent investigation on a tabula rasa, Agudelo reached out to

---

[8] "González gave specific instructions that the next step was to obtain consent. In fact, González admitted that, had they not gotten consent, they would have had to come up with an alternate plan." (Docket No. 191 at 34).

Martorell with the intention of getting consent to search the computer held by the PRPD." (Docket No. 191 at 34).

The Government strongly urges the Court not to accuse the federal agents of engaging in misconduct for carrying out a separate investigation, arguing that the "application of the exclusionary rule is a draconian measure that is geared towards "deterring lawless conduct by federal officers," and "closing the doors of the federal courts to any use of evidence unconstitutionally obtained." (Docket No. 208) (citing Brown, 422 U.S. at 599.) As such, the Government argues against suppression because there is no "lawless conduct to deter." Id.

In no way is the Court condemning the Government's efforts to conduct an independent investigation. Nevertheless, the federal authorities should have steered with more caution rather than jump the gun. In Puerto Rico, as in many other jurisdictions, federal and state authorities work together to combat crime. All things considered, the Court finds that the flagrancy of the not-so-independent federal investigation constitutes the type of behavior the exclusionary rule aims to deter.

### iv. *The Finucan Factors*

As stated previously, "[t]he question whether evidence obtained after an illegal search should be suppressed as the fruit of the poisonous tree depends upon 'whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Finucan, 708 F.2d at 843 (quoting Wong Sun, 371 U.S. at 488.)

The first Finucan factor echoes the Court's discussion above. Absent the illegal search, would the investigators have known the identity of all of the third parties or what to ask? Did the government anticipate that the illegal search would help lead it to the other evidence? As analyzed in the Court's discussion of the third Brown factor (i.e., purposeful and flagrant police misconduct)

the federal authorities used the PRPD's investigation for leads to guide their independent investigation.

The Court agrees with the Magistrate Judge's finding that "[a]s in <u>Finucan</u>, *the agents banked on the illegally obtained evidence in guiding their investigation, at least in the beginning.*" (Docket No. 191 at 34) (emphasis added). It is uncontested that the federal authorities used the PRPD investigation to map their own investigation and thus, they expected it would lead them to the unlawful material. Consequently, this factor weighs in favor of exclusion.

The second <u>Finucan</u> factor, "[w]hether 'third parties would have come forward on their own had the investigators not sought them out" also weighs in favor of exclusion. Martorell expressed —on multiple occasions—her desire to help the authorities. <u>Finucan</u>, 708 F. 2d at 844. However, as Magistrate Judge Carreño-Coll pointed out, she did not do so until she was approached. "Even though Martorell emphasized that she wanted an independent federal investigation, the fact is that she did not come forward on her own." (Docket No. 191 at 34.) The fact that Martorell did not contact the authorities, having the opportunity to do so, but instead she waited for them to contact her supports the reasoning above as to the absence of intervening circumstances and that the federal authorities, by way of her involvement in the investigation, exploited the illegality.

Finally, the Court turns to the purpose of the exclusionary rule, deterrence. "The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." <u>Brown</u>, 422 U.S. at 599–600 (internal citations and quotations omitted). "But despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." <u>Brown</u>, 422 U.S. at 600 (internal citations and quotations omitted).

"For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." Davis, 564 U.S. at 237. The Supreme Court has cautioned that the exclusionary rule "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.'" Id.

Having taken into account the totality of the circumstances, and after weighing the Brown and Finucan factors, the Court finds that the 320 GB External Hard Drive was not obtained by means sufficiently distinguishable, but rather by exploitation of the illegality. Consequently, the external hard drive is tainted by the prior unlawful searches and therefore, must be excluded. Regrettably, such determination comes at a high price insofar as "[t]he exclusionary rule generates substantial social costs, . . . which sometimes include setting the guilty free and the dangerous at large." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (internal citations and quotation marks omitted).

### C. MMTH's Live Testimony/ CyberShot Camera

The Court turns to the attenuation/taint analysis of the testimony of MMTH and the Cybershot Camera. When applying the exclusionary rule to live-witness testimony, a closer more direct link between the illegality and that kind of testimony is required. United States v. Ceccolini, 435 U.S. 268, 278 (1978).

Magistrate Judge Carreño-Coll recommends MMTH's live testimony be admitted because pursuant to Ceccolini, "MMTH would have come forward, either on her own, or prompted by her mother." (Docket No. 191 at 42.) Magistrate Judge Carreño-Coll further reasoned that: "Hornedo's eagerness to reach out to federal authorities, which she displayed again during the hearing in this

case by contacting the prosecutor and asking to testify out of her own will, is a testament to her disposition. The same can be said for MMTH." (Docket No. 191 at 42-43.)

> An examination of these facts leads to the conclusion that those statements were the product of detached reflection and a desire to be cooperative. Ultimately, the record shows that the illegality which led to the discovery of MMTH did not play a significant part in her willingness to come forward.

(Docket No. 191 at 43.) Cordero-Rosario argues that the Magistrate Judge's finding is unsupported. (Docket No. 201.) The Government opposes this contention and argues that "MMTH's willingness to come forward is supported not only by the testimony of Idalia Hornedo, the minor's mother, but also by the testimony of Special Agent Agudelo who interviewed MMTH." (Docket No. 208 at 22.) Further, the Government argues that "MMTH freely and voluntarily agreed to be interviewed demonstrated her willingness to come forward and cooperate with the authorities. So voluntary and free was her cooperation that she alerted Agent Agudelo to the existence of the Sony Cyber Shot camera." (Docket No. 208 at 22.)

"The greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness." Ceccolini, 435 U.S. at 27-78.

> Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.

Ceccolini, 435 U.S. at 27-78. The circumstances that led to MMTH's involvement in the investigation follow.

> When contacted by Agudelo, MMTH did not refuse to be interviewed and nothing on the record shows that her testimony was coerced in any way. In fact, while

being interviewed, MMTH narrated unpleasant details about her interactions with Cordero and revealed that she possessed the camera where the seized pictures had been taken, information that was not known to the PRPD. Moreover, the interview with MMTH took place in May, three months after the PRPD had illegally seized Cordero's computer.

(Docket No. 191 at 42-43.)  Relevant to the Court's consideration is the second <u>Finucan</u> factor, "[w]hether third parties would have come forward on their own had the investigators not sought them out."  <u>Finucan</u>, 708 F.2d at 844.  With this element, "the 'degree of free will' exercised by those who come forward and offer evidence entirely of their own volition" is of particular pertinence. <u>Ceccolini</u>, 435 U.S. at 276; <u>see also</u>  <u>Garcia-Aguilar v. Lynch</u>, 806 F.3d 671, 675 (1st Cir. 2015).

The undersigned agrees with Magistrate Judge Carreño-Coll's finding that MMTH would have come forward on her own, had she not been sought out by the authorities. The circumstances surrounding MMTH's involvement weigh strongly in finding that MMTH's live testimony was sufficiently attenuated from the initial illegality.  (Docket No. 191 at 43.)  The undersigned adopts Magistrate Judge Carreño-Coll's factual findings and legal conclusions regarding the admissibility of MMTH's live testimony and the Sony Cybershot Camera.

## V.    <u>Conclusion</u>

Upon *de novo* review, the Court **ADOPTS** Magistrate Judge Carreño-Coll's Report and Recommendation at Docket No. 191 consistent with this Opinion.  For the foregoing reasons, **GRANTS IN PART and DENIES in part** the Government's "Motion in Compliance Explaining Why None of the Government's Evidence Should Be Suppressed" at Docket No. 135.

To sum up, the Court **SUPPRESSES and EXCLUDES:** 1) the evidence found during the search of the family computer during the "federal investigation" —including the sexually explicit images of MMTH, and chat conversations between Cordero and MMTH contained therein, and 2) the evidence obtained from the 320 GB External Hard Drive.

The Court **ADMITS**: 1) the live testimony of MMTH, and 2) the Sony Cyber Shot Camera.

**SO ORDERED.**

In San Juan, Puerto Rico this 18th day of May, 2017.

*s/ Gustavo A. Gelpí*

GUSTAVO A. GELPI

United States District Judge